# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                     Case No. 10-80102-DHW
                                          Chapter 7

MALCOLM CLIFTON DAVENPORT, V,

       Debtor.

FRONTIER BANK,

       Plaintiff,

v.                                        Adv. Proc. No. 10-8009-DHW

MALCOLM CLIFTON DAVENPORT, V,

       Defendant.

## MEMORANDUM OPINION

In this adversary proceeding, Frontier Bank seeks a judgment holding its claim against Malcolm Clifton Davenport, V, nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(b).[1]  Trial was held on January 27, 2011.  At trial, the plaintiff was represented by Sherrie L. Phillips, and the defendant was represented by Michael A. Fritz, Sr.

Upon consideration of the facts and the law as set out herein, the court concludes that Frontier Bank's claim against Malcolm Clifton Davenport, V, is nondischargeable.

---

[1] The complaint, in a second count, sought to deny the debtor a discharge of all of his debts under 11 U.S.C. § 727.  On June 9, 2010, that count of the complaint was dismissed with the consent of the parties.  *See* Doc. #15.

Jurisdiction

The court's jurisdiction in this dispute is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district wherein that court's jurisdiction in title 11 matters was referred to the Bankruptcy Court. *See* General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 23, 1985). Further, because the dispute here requires a determination of the dischargeability of a particular debt, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) thereby extending this court's jurisdiction to entry of a final order or judgment.

Factual Findings

<u>Loan Summary</u>

The debtor and his wife obtained a loan from the predecessor of Frontier Bank in the amount of $150,000 on November 20, 1997 for the purpose of building a home at 1140 North 18th Street, Lanett, Alabama.[2] As their plans for the house grew, so did the loan. By January 1998, the loan grew to about $1 million; by August 1998, the loan grew to $2.5 million; and by October 1998, the loan grew to a total of $3 million.[3] The house was very unique and located in a rural community on twenty acres.

From its inception in November 1997, the loan was renewed a total of 23 times, the last renewal occurring on October 22, 2009. At some point in time, the loan changed status with the bank. The bank's credit memorandum dated November 2006 states: "This loan has been a classified credit in the bank for quite some time because of the lack of repayment and the reduction in collateral value." "A principal reduction is expected at the next renewal." Ex. 63, p. 2. Before that time, the debtor

---

[2] The loan was made by Valley National Bank of Lanett, Alabama which later merged with First National Bank of Sylacauga to become Frontier Bank.

[3] The debtor obtained a $500,000 loan in October 1998. *See* Ex. 15.

2

had made solely interest payments on the loan. The bank would not have continued to renew the loan without interest payments.

In 2007, in addition to interest payments, the debtor began making semi-annual principal payments in the amount of $50,000. The debtor made three principal payments. At least two of those payments were made with money borrowed from a family member. The debtor had always made his interest payments timely, but by October 2009, he became past due on interest payment.

At the last renewal in October 2009, the principal balance on the loan was about $2.85 million. The last renewal was made because the debtor brought the account current and agreed to work toward selling the home. The debtor filed the chapter 7 petition three months later on January 22, 2010.

During the twelve-year pendency of the loan, the debtor submitted to the bank a total of eight financial statements. The first was submitted in December 1997 just before the first renewal. The last was submitted in September 2009 just before the last renewal. The financial statements submitted in 1997, 1999, and December of 2002 included his wife's financial information. The other five did not. Janet Sikes, a CPA, prepared the first financial statement. The debtor prepared the other seven himself. In so doing, he followed the format of the first statement and did not utilize the bank's financial statement form.

In considering each renewal, the loan officer drafted a credit memorandum. The credit memorandum included a synopsis of the information in the financial statement. The credit memorandum also included information such as the bank's explanation of the loan, the history of the borrower, the breakdown of the loan, the borrower's ability to repay, valuation of the collateral, and a recommendation to issue or renew the loan. In most cases, the credit memorandum is drafted prior to a renewal.

In addition, with later renewals, the bank also drafted a loan approval

3

request. A loan approval request summarizes the financial information derived from the borrower's last submitted personal financial statement. The loan approval request provides executive management with a snapshot of the borrower's summary status without the necessity of reading all of the loan's supporting documents.

The Debtor's Personal History

The debtor is a lifetime resident of the Valley area in Alabama. His extended family includes the Lanier family, a very prominent family in that area. The debtor graduated from college with a degree in accounting and practiced a few years in the accounting field. He attended Cumberland School of Law in 1978. After graduating in 1981, he spent a year studying tax law in the LLM program of the University of Miami. The debtor practiced law for about 2 years. He was admitted to practice law in both Georgia and Alabama, although he maintained an inactive status in both states for several years. He license is active now only in Georgia.

The debtor shared an accounting practice in 1994 or 1995 as an "accommodation" to his partner. He did not practice himself. In 1997, he had four people working for him, but by 1999 he had no staff other than a consultant that helped him pay bills and stay current. He served as a board member of a number of privately-held companies. He served as director of some family companies and some telephone companies in the Valley. He considers himself a consultant and investor.

Overview of Financial Statements

The bank always requested updated financial statements – it was a constant request with its customers. The debtor submitted eight financial statements over the twelve-year period of the loan. Under bank policy, a financial statement would become stale after 15 months.

Shortly after the initial loan was made in November 1997, the debtor and his wife had assets of $7.7 million, liabilities of $947,000, and a net

worth of $6.85 million. Their assets primarily consisted of about $5 million in securities (publicly traded and closely held) and $2.3 million in real estate. The debtor owned stock in over 25 companies. The value of his shares in ITC DeltaCom, Inc. was over $1 million. The value of his shares in two other companies each exceeded half of a million dollars.

By February of 1999, they had assets of $11 million, liabilities of 4.7 million, and a net worth of $6.6 million. A year later, the debtor had assets of $17 million, liabilities of $3.6 million, and a net worth of $13 million. The increase in assets was primarily due to an increase in the value of the debtor's stock, real estate, and "demand notes receivable." A company called Spintek Gaming Technologies owed the debtor $3 million. The increase of liabilities was primarily due to the increase in the subject loan to build a home.

By March 2002, the debtor had sustained a dramatic downturn. Though he listed assets of $13 million, his liabilities increased to $8.5 million, leaving him with a net worth of $4.4 million. The value of his stock in publicly traded companies had plummeted from $7.8 million to $156,400. However, the value of "receivables and licenses" had increased to $5.8 million. The increase in his liabilities was primarily due to the $3.9 personal guaranty of a loan by RBB, an Austrian bank, to his family trust.

The December 2002 financial statement reflects assets of $14 million, liabilities of $4.8 million, and a net worth of $9.6 million. The value of his securities declined, but the value of receivables and royalties increased to over $7 million. The personal guaranty to RBB is not listed.

Over the next 35 months, the debtor sustained another dramatic downturn. In November of 2005, the debtor listed assets of $8 million, liabilities of $5 million, and a net worth of only $3 million. His securities fell to a value of only $57,900.

His financial situation continued to decline. By July of 2007, the debtor listed assets of only $4.9 million and liabilities of $4.9 million,

leaving a net worth of only $28,817. The home collateralizing the note to Frontier is listed as the debtor's chief asset and also his chief liability.

By September of 2009, the debtor's financial picture had turned upside down, with assets of $4.9 million, liabilities of $5.7 million, and a negative net worth of minus $773,417.

IRS Liability

The bank, as a community bank, traditionally never requested tax returns. Due to changes in the economy, requesting tax returns has been a standard practice since 2005 or 2006.

The debtor's 1998 and 1999 tax returns reflect an unpaid tax liability of about $270,000 and $300,000, respectively. The debtor did not file his tax returns for 1998, 1999, and 2000 until September 2001. He testified that in 1999 and 2000 he did not know that he had tax liability because his returns had not yet been filed. He had "invested a great deal of money" and "had not run the numbers."

The March 2002 financial statement does not list any tax liability, even though the debtor filed the outstanding returns in September 2001. The December 2002 financial statement does list "Other liabilities" of $950,000, but this category is not itemized. The November 2005 statement lists "Other liabilities" at $1.45 million, as does the July 2007 statement. These are similarly not itemized.

The debtor testified that, bank policy or not, the bank had been asking for his returns, so when he "got them," he submitted them to the bank. However, the bank did not become aware of any potential tax liability of the debtor until mid to late 2002, when it received notice from the IRS of a tax lien. A notice of tax lien issued in November 2002 reflecting liability of $860,380, or over $400,000 each for tax years 1998 and 1999. Another notice of tax lien issued in August 2004 reflecting liability of $22,532 for tax year 2001.

6

Jimmy Yates, senior vice-president of Frontier Bank, talked with the debtor about his tax liability from that time forward. The November 2006 credit memorandum states: "Mr. and Mrs. Davenport have been negotiating with both the IRS and Alabama Department of Revenue relating to tax issues for the past several years." "Income tax returns are not available at this time." The credit memorandum dated June 3, 2008 contains the following statement: "Customer has reportedly resolve their tax issues." The debtor testified that the taxes were not settled, and he does not recall giving Yates that understanding.

Steve Townson, chairman of the board and CEO of the bank, testified that the bank does not lend money to borrowers with IRS liability or outstanding returns because it's "an unknown," "a risk that cannot be identified." He also testified that the bank would not have fully funded the loan at $3 million had it known of any tax liability. However, at the time the loan was fully funded, the debtor's 1998 tax return was not yet due.

The debtor did not disclose any tax liability on his financial statements until September 11, 2009. That statement reflects a federal tax liability of $1.5 million, and a state tax liability of $250,000.

RBB Liability

RBB is an Austrian bank that was later acquired by Capital Bank. The debtor's relationship with RBB began sometime in 1996 or 1997. At first, RBB bought a $5 million debenture that was convertible into Spintek stock, a company owned by the debtor that specialized in technology for the gaming industry.[4] According to the debtor, a personal guarantee was not required for this debt because RBB was an investor in Spintek.

After the loan to Spintek, RBB also loaned money, over time, to the debtor's family trust. The debtor stated in deposition: "There was money

_____

[4] Debtor's Deposition, Ex. 85, p. 57-58. At some point, RBB converted the debenture and sold the stock. *Id.* at 59.

7

borrowed. There was monies paid back. There was monies borrowed. It was a fluid – fluid deal."[5] The money that RBB loaned to the trust, the debtor, in turn, loaned to Spintek. The debtor testified that he does not recall when the trust began borrowing the money. However, Spintek filed chapter 7 in November 2001, so the debt of the trust must have arisen before this date.

RBB also loaned $315,000 to the debtor individually shortly after Spintek filed bankruptcy.

The debtor personally guaranteed the debt to his family's trust. In deposition, he stated that he "personally guaranteed everything [RBB] ever did except for the initial investment into Spintek."[6] Also in deposition, the debtor affirmed that he had personal obligations to RBB throughout 1996 through 2001.[7] At trial, however, the debtor testified that he was mistaken in his deposition. He stated that RBB did not request the personal guarantee until Spintek filed bankruptcy because they no longer felt comfortable with Spintek stock as collateral. According to his testimony at trial, the personal guarantee to RBB did not arise until after November 2001.

RBB first appeared on the debtor's financial statement to Frontier Bank in March 2002. That statement reflects two debts to RBB: a $315,000 note payable and a personal guarantee of $3.9 million owed by his family trust. Yates understood this was an obligation related to the gaming industry and different companies in which the debtor was involved. The RBB debts did not reappear on any subsequent financial statements, including the December 2002 financial statement.

In December 2003, the debtor, his family trust, and Capital Bank

---

[5] *Id.* at 57.

[6] *Id.*

[7] *Id.* at 56.

8

(formerly RBB) entered into a "Final Settlement Agreement" requiring the debtor to pay $300,000 to Capital Bank. In exchange, Capital Bank assigned the majority of the debt to RiverCity Acquisitions, Ltd., a creditor friendly to the debtor.[8] Capital Bank retained $700,000 of the indebtedness, for which the debtor remained liable.[9]

The debtor also remained liable for the debt to RiverCity Acquisitions. The debtor did not list the obligation to RiverCity Acquisitions on his subsequent financial statements. When questioned why, he testified, "Well, Larry told me not to worry about it." Larry is the friend to whom the debtor transferred ownership of RiverCity Acquisitions. The debtor never paid any of this debt. He listed RiverCity Acquisitions as a creditor in this bankruptcy case with a claim in the amount of $5 million.

Steve Townson and Jimmy Yates understood from conversations with the debtor that the "RBB" debt had been "settled" or "satisfied." Yates thought the debtor was to pay $300,000 in exchange for the release of the debt. At that time, Yates did not see any paperwork related to the transaction. The $300,000 was wired from Frontier Bank.

The "Final Settlement Agreement" states the following: "Both MCDV [debtor] and Trust have been clients of Bank since 1997. Since that time, substantial monies have been borrowed from Bank by Trust and MCDV, all of which were personally guaranteed by MCDV." Ex. 86, p. 1. When the settlement agreement was executed, the debtor owed Capital Bank $51,336, and the Trust owed Capital Bank $4.9 million.

---

[8] RiverCity Acquisitions is a company that the debtor started. However, before the debt to Capital Bank was assigned, the debtor transferred his interest in the company to a friend. If the debt had been forgiven, he would have owed taxes. Therefore, instead, he had the debt assigned to RiverCity Acquisitions.

[9] The debtor testified that this $700,000 obligation was satisfied by the sale of the stock serving as collateral. He has no documents to confirm this. He states that he confirmed this with a telephone call to Capital Bank.

At trial, the debtor was presented with the language of the agreement and questioned whether he had personally guaranteed debt to RBB since 1997. He stated that he would not argue with that. He further stated that the language in the settlement was inconsistent with his recall, but it "may be correct."

## Contingent Liabilities

The financial statements that the debtor submitted to Frontier Bank do not reflect any contingent liabilities other than the debtor's personal guaranty of the debt to RBB on the March 2002 statement. However, the debtor personally guaranteed the debts of Clifcoe and Sunset Land Holdings, two companies in which he had an ownership interest.

The personal guaranty of Clifcoe's debt was in the range of several million dollars. The debtor did not recall the amount of the personal guaranty to Sunset Land Holdings.

The debtor testified that he did not know that contingent liabilities needed to be on the financial statement. He stated that the bank never requested that contingent liabilities or personal guaranties be listed and never asked him about his contingent liabilities; it was never discussed.

The debtor testified that, as an accountant, he is aware that contingent liabilities are part of one's overall financial picture. However, at the time, Clifcoe was "doing well and building." The property serving as collateral was worth more than the debt. He testified that he was not sure how one would report such a guaranty, and stated as follows:

> When the liabilities that were contingent exceeded the assets, I put them on the return. As long as the assets that the liabilities were associated with were in excess of the liabilities, I did not. So yes, I think I correctly portrayed my financial picture at the time that I presented the financials.

10

When asked if this comported with accounting standards, he testified that he did not know and that he had not "read GAAP in years." He further testified:

> They knew I was involved in businesses that were building and they should have known I was borrowing money in these businesses. If I am putting up houses, I am not doing it out of cash flow. And if they had asked me, I certainly would have provided them immediately, okay. I did everything I knew how to do and was as transparent as I could be to these guys.

Steve Townson testified that he would expect that someone with Davenport's education and expertise would know how to report contingent liabilities. If none are disclosed, he would think they did not exist.

Closely Held Companies

About the time the loan was made, the debtor held an interest in six closely held companies. The number of companies varied with each financial statement. The March 2002 statement reflects an interest in ten companies. The December 2002 statement reflects an interest in only seven companies, and the November 2005 statement reflects an interest in only two.

Clifcoe, Inc. was a construction company owned by the debtor equally with Coe Strauther. The financial statements reflect the following with regard to the value of the debtor's interest in the company and the amount of the note owed by the company to the debtor:

| Date | Value | Note Payable to Debtor |
|------|-------|------------------------|
| December 1997 | $40,000 | $200,000 |
| February 1999 | $100,000 | $650,000 |
| February 2000 | $425,000 | None listed |

| | | |
|---|---|---|
| March 2002 | $400,000 | None listed |
| December 2002 | $200,000 | None listed |

Clifcoe did not appear on subsequent financial statements.

At one point, Clifcoe had 150 apartments in Auburn proper. When questioned about the December 2002 decrease in value, the debtor testified that the occupancy levels had declined because there were a lot of newer properties. In deposition, he stated: "It was just – it was pick a number, you know, what do you think it's worth. You know, the market was beginning to decline a little bit there. . . ." Ex. 85, p. 83. "Every one of these numbers is a guess. Unless it's traded, you have – you know no – you pick a number and you – of what you think it's worth and you – you go with that." *Id.* at 84. The debtor further explained at trial that, though the numbers were a guess, they were educated guesses based on conversations with Coe, who was more familiar with the Auburn market.

The debtor is not sure why the note disappeared on his financial statements. He speculated that he may have "contributed" the money to the company. The note was never repaid. There was no reason to enforce the note, if any, because either Clifcoe or Strauther went bankrupt, and there was nothing to collect.

The debtor formed Sunset Land Holdings to develop some real property in Florida. He was the sole owner. Sunset first appeared on the February 2000 financial statement. The financial statements reflect the following:

| Date | Value | Note Payable to Debtor |
|---|---|---|
| February 2000 | $250,000 | None Listed |
| March 2002 | $250 | $2.3 million |
| December 2002 | $250 | $2.4 million |

The company did not appear on the November 2005 statement or any

subsequent financial statements.

The debtor may not have had a promissory note documenting his loan to Sunset. The loan was never repaid. He had hope until sometime in 2006 that he would be able to collect. He testified that the bank took back all of the assets in Perdido, and the personal guaranty was wiped clear. He did not try to collect the note because there were no assets.

The debtor listed a company called Horizon, Inc. on his December 1997 financial statement. He valued his ownership interest at $50,000. The company did not appear on subsequent financial statements. The debtor testified that the company did not make any money, and he wrote it off. His 1999 tax return reflects that he lost $83,000 on that investment.

The debtor also had a 50% interest in Ardent Technology, LLC, which first appeared on his March 2002 financial statement. The debtor formed Ardent from assets he purchased from the bankruptcy estate of Spintek. The debtor credit bid the assets for $1 million. Ardent specialized in technology for the gaming industry. The debtor's financial statements reflect the following:

| Date | Value | Note/Royalty Receivable |
|------|-------|-------------------------|
| March 2002 | $2 million | $3.5 million |
| December 2002 | Not Listed | $5 million |
| November 2005 | Not Listed | $3.5 million |

Ardent does not appear on any subsequent financial statements. The debtor testified that he was not sure if the note from Ardent was payable to the himself or the family trust. The financial statement does not disclose that the note served as collateral for the debt to RBB/Capital City and later, its assignee, RiverCity Acquisitions.

When questioned regarding the $2 million valuation of his 50% interest in assets purchased for only $1 million, the debtor testified that

13

there was no need to bid higher because there were no other purchasers. Ardent did not succeed and closed.

The bank relied on the information provided by the debtor concerning his closely-held companies and did not attempt to independently verify that information beyond discussions with the debtor. Yates testified that, at the time, he had no reason to believe the debtor's values were untrue. Looking back, he now believes the values were not true because of their wide fluctuations and precipitous declines.

The debtor testified that it was difficult to value his interests in the closely-held companies. Because they are not publicly traded, there is no index of value. He testified that all he could do, short of hiring an appraiser, was to "take a look at the numbers and try to figure out what the market would bear." He was not the principal "in any of these companies," so he "contacted the people that were running the various companies, and we looked at sales prospects and expected earnings over a period of time, and then you try to figure what that would be worth in the market." The debtor testified that when he completed the financial statements, the values presented were "as good as I could do." He "gave it [his] best shot," and gave the bank his "best effort" at valuation.

<u>Undisclosed Assets</u>

The debtor did not disclose on his financial statements some interests in companies that were reported on his tax returns. The debtor testified that some of these were companies in which he sustained losses.

<u>Liability to Columbus Bank & Trust</u>

On the initial financial statement dated December 1997, the debtor listed two notes payable to CB&T in the amounts of $250,000 and $75,000, for a total of $325,000. By December 2002, the notes had grown to $375,696. The debtor continued to list this liability on all but 2 subsequent financial statements: November 2005 and July 2007. The liability re-

appeared on his financial statement in September 2009 in the amount of $500,000. The debtor testified that the omissions in 2005 and 2007 were an oversight.

Omitted Creditors

When the debtor filed the chapter 7 petition in January 2010, he listed some creditors in the schedules that had not appeared on his September 2009 financial statement, such as a debt or $270,000 to Cam Lanier. The debtor testified that Cam had told him not to worry about it. The debtor also failed to list a debt to Patrick McGrath in the amount of $171,000. The debtor testified that Patrick had agreed to forgive the debt "when you're ready." The debtor also failed to list a debt to William Harrell in the amount of $8,000. The debtor testified that this debt was "very much disputed."

Bank Reliance on Financial Statements

Yates and Townson testified that it is normal, customary and reasonable for banks to rely on financial statements. They rely on them on a continual basis to make credit decisions.

Townson testified that the bank requested financial statements from the debtor in a methodical manner even though the debtor did not submit them regularly. The bank relied on the financial statements the debtor submitted.

Frontier Bank reviewed each financial statement and incorporated the information provided into a credit memorandum and loan approval request. The bank also discussed with the debtor any questions that it had about the information provided. The credit memorandum was predicated on both the financial statement and conversations with the debtor.

The bank had numerous conversations with the debtor. For instance, the bank discussed with the debtor his ventures into the gaming industry,

including the alleged values, opportunities within the industry, the specific technology he was working on, and opportunities to sell the technology within the industry. The bank questioned the debtor regarding his obligation to RBB and his potential receipt of income from Sunset Land Holdings. The bank had ongoing discussions about his tax liability. The debtor's responses led the bank to feel "comfortable" with the information provided.

The bank considered factors in addition to the financial statements in determining whether to make and renew the loan, including the debtor's qualifications as both a certified public accountant and an attorney, the debtor's relationship to the Lanier family, and his service as a board member of a number of privately-held companies. Yates testified that the bank probably relied more heavily on the information provided by the debtor because of his credentials.

In 2006, the debtor received $802,000 in distributions based on his membership in Newton Estates Development, LLC. The money was placed in an account at Frontier Bank. The bank relied on the debtor's receipt of this money as an indication of the debtor's then-ability to repay the loan. The debtor testified that he used a large part of this money to make interest payments to the bank.

The bank also relied on the debtor's consistent ability to make interest payments. Later in the loan, the bank further relied on his apparently ability to make principal reductions.

Debtor's Testimony in Defense

The debtor testified that he gave the financial statements his best efforts at the time. He made mistakes, but they were not intentional. In 2002, the ITC DeltaCom stock securing the loan was worth several million dollars. It went from $40/share to a fraction of a penny the next year. Since then he has been trying to

16

take the scraps and recover enough to where I could get the
bank paid and get myself back on my feet, and I survived for
ten years and I made two million dollars in interest payments
to the bank fighting, trying to not be sitting where I am right
now, but unfortunately I ran out of rope. And, you know, the
bank worked with me. They tried. They knew what was going
on. Jimmy Yates told me, He said, "I pray for you everyday."
He knew how stressed things were because I made it a point
to try to be completely clear. If they asked for something, I got
it to them. . . . I think they knew exactly what was going on
and, where I was, I think they were praying that one of these
things that I was working on would come to fruition. . . .

Trial Transcript, pp. 187-88. Further the debtor testified that the bank did
not rely on the financial statements:

I think they relied initially, according to the credit memo that
I saw, there was a statement in there that said our recovery,
our repayment on this debt depends on timely liquidation of
the collateral, and I think they looked at the collateral initially
and then, when it went to no value, I think they started praying
just like I was, that one of these opportunities was going to
turn into something real.

Id. at 189. He also testified that renewals were predicated solely on
interest payments: "That's all it was contingent on. I was never asked, you
know, let's see your financials and we will decide whether we will renew
this thing. They said make the payment and we will renew it." Id. at 193.
He stated that requests by the bank for financial statements were prompted
by anticipated visits of bank examiners.

Statute and Case Law

A debt obtained by fraud is not dischargeable in bankruptcy. The
statute provides in relevant part:

17

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . .

        (B) use of a statement in writing—

            (i) that is materially false;

            (ii) respecting the debtor's or an insider's financial condition;

            (iii) on which the creditor to whom the debtor is liable for such money, property services, or credit reasonably relied; and

            (iv) that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B).

An exception to discharge is to be strictly construed, and the creditor bears the burden of proving the exception.[10]  *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986), abrogated on other grounds, *Grogan v. Garner,* 498 U.S. 279 (1991).  Exceptions are construed strictly to give effect to the fresh start policy of the Bankruptcy Code.  *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-65 (11th Cir. 1995). The creditor must prove each of the elements by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

Reasonable reliance is an objective test requiring conduct consistent with the standard of the reasonable man.  "Reasonable reliance connotes the use of the standard of ordinary and average person."  *City Bank & Trust*

---

[10] *See Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 304 (11th Cir. 1994). "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,'" recognizing that the "'reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *Id.* (citations omitted).

*Co. v. Vann (In re Vann)*, 67 F.3d 277, 280 (11th Cir. 1995). The Tenth Circuit has stated:

> This standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations. Of course, the reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.

*First Bank v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987), abrogated on other grounds, *Field v. Mans*, 516 U.S. 59 (1995). The Fifth Circuit has stated:

> The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances. The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993).

Black's Law Dictionary defines "material" as "of such a nature that knowledge of the item would affect a person's decision making; significant; essential." *Black's Law Dictionary* (9th ed. 2009). A "material representation" is one "to which a reasonable person would attach importance in deciding his or her course of action in a transaction." *Id.* A "material fact" is one "that is significant or essential to the issue or matter at hand." *Id.*

19

## Conclusions of Law

With regard to the first element of 11 U.S.C. § 523(a)(2)(B), the debtor made materially false representations in his financial statements.

First, the debtor made materially false representations with regard to his tax liability. The debtor failed to disclose a known federal tax liability for years 1998 and 1999 of over $550,000 on his March 2002 financial statement. In November 2002, the IRS issued notices of tax liens for $860,380. This liability was not disclosed on any financial statement until September 2009, by which time his federal tax liability had grown to $1.5 million. Further, the court concludes that in 1999 and 2000 the debtor was most certainly aware that he owed taxes to the IRS for years 1998 and 1999 even though he had not yet filed his returns for those years.

Second, the debtor made materially false representations with regard to his liability to RBB. The debtor did not disclose his personal guarantee of the loan to his family trust until March 2002 even though the debt arose in 1997. In March 2002, the debt approached $4 million. The debtor further failed to list this liability on his December 2002 financial statement. The debt was assigned to another, albeit friendly, creditor in December 2003. However, the debt never appeared on his subsequent financial statements. The debtor listed the debt on his bankruptcy schedules in January 2010.

Third, the debtor never disclosed his personal guaranties of the loans to Clifcoe and Sunset land Holdings. The personal guaranty on behalf of Clifcoe was in the range of several million dollars.

Fourth, the debtor omitted several creditors on his final financial statement dated September 2009, including Cam Lanier, Patrick McGrath, and William Harrell. These liabilities totaled $449,000.

The bank did not prove by a preponderance of the evidence that the debtor made materially false statements with regard to his closely-held

companies.  The bank offered no independent evidence to show that the statements were untrue.  The bank implied that the valuations must be false because they changed dramatically from one statement to another and because the debtor engaged in "pick-a-number."

However, the court disagrees.  Examining Clifcoe, the company which appeared on the most financial statements, the values rose or fell consistently over time.  Further, the debtor engaged in deeper analysis than simply "pick-a-number."  The debtor testified that he contacted the principals of the companies, and they considered sales prospects within the market and expected earnings over a period of time.  There is some subjectivity in valuing a closely-held company because its shares are not publicly traded.

The bank also alleges that the debtor omitted assets on his financial statements that he included on his tax returns.  However, these assets would have only strengthened his financial statements.  The court concludes that the bank did not rely to their detriment on the omission of these assets.

The parties do not dispute that the above statements were in writing and respected the debtor's financial condition.  The parties do dispute that the statements were reasonably relied upon by the bank and were made with the intent to deceive.

The court concludes that the bank reasonably relied upon the statements.  The evidence reflects that the bank reviewed each financial statement.  The bank did not take the financial statements at face value. The bank asked the debtor questions about the information and, in some instances, had ongoing and extensive discussions with the debtor.  The bank incorporated its conversations with the debtor and the numbers from the financial statement into a credit memorandum, a comprehensive document of considerations relevant to the loan or renewal.

The bank probably relied more heavily on the information provided

by the debtor because of his education, training, and experience. This is reasonable. The debtor was qualified as both a certified public accountant and an attorney and had sat on the boards of directors of several companies. He had spent a year toward an LLM in taxation. Further, the Lanier family's standing in the community gave the debtor enhanced respect and credibility. All of these factors combined to lend even more credence to his financial statements.

The bank did not rely exclusively on the information in the financial statements. Nor would it have been prudent to do so. But the fact that the bank did not rely exclusively on the financial statements does not mean that the bank did not rely at all on the financial statements. "The Bank does not have to demonstrate that a financial statement was the only factor influencing its credit making decision. Partial reliance is all that is needed." *First Commercial Bank v. Robinson (In re Robinson)*, 192, B.R. 569, 576 (Bankr. N.D. Ala. 1996). The bank has more than met that burden.

The debtor contends that the bank did not reasonably rely on the financial statements because there were numerous "red flags" that would have alerted an ordinarily prudent lender. The debtor mentions things like the absence of tax returns in the early years of the loan, mathematical or typographical errors on the face of the financial statements, the disappearance of an asset, the appearance of a liability, the absence of Mrs. Davenport's assets and liabilities, the staleness of a financial statement, the amount of the debtor's "other liabilities," and increases or decreases in the debtor's net worth.

However, it was not the bank's policy to request tax returns early on. Further, other than the disappearance of the RBB liability on the financial statements, the red flags asserted by the debtor are not those for which the debtor is being held accountable by this opinion. The bank did question the debtor regarding the RBB liability and was told it was "settled." It is expected that a debtor's balance sheet will change over time, and that assets and liabilities may come and go.

22

In addition, the court recognizes that, once the loan was fully funded, the posture and interests of the bank changed. The bank was then in the posture of loan management, and its interests lay in repayment of the principal and interest on the loan. As Yates testified, by that time, the money was "out the door" for the bank. It would then be in the bank's best interest to extend rope to the debtor as long as it thought that doing so could enhance its prospects of repayment – despite a less than perfect financial statement.

Further, the bank concludes that the debtor made the materially false statements with the intent to deceive the bank. Intent to defraud is rarely openly admitted, and often, such intent is not apparent on its face. Therefore, courts must look to the surrounding circumstances to determine whether fraudulent intent should be inferred.[11]

No financial statements were filed before the $150,000 loan was made in November 1997. The debtor submitted a financial statement in December 1997, and that is the only financial statement that was submitted before the loan was fully funded in October 1998. The evidence with respect to false misrepresentations on this financial statement is less definitive. For instance, the evidence shows that the personal guaranty to RBB preceded the making of the loan in 1997. However, the evidence does not reveal the amount of the guaranty as it existed in December 1997. The debtor testified that the loan from RBB was fluid – monies were loaned and paid back and loaned again. The evidence does not show the date on which his guaranties on behalf of Clifcoe and Sunset arose. And the debtor's tax liability for 1998 had not yet arisen at the time the loan was made in 1997.

The most egregious omissions in the debtor's financial statements

---

[11] "A finding of fraudulent intent 'may be based on inferences drawn from a course of conduct' or 'inferred from all of the surrounding circumstances.' *See In re Olmstead*, 220 B.R. 986, 994 (Bankr.D.N.D.1998) (citations omitted)." *In re Guadarrama*, 284 B.R. 463, 472 (C.D. Cal. 2002).

occurred after the loan was fully funded in October 1998. The omissions kept the bank from understanding the true nature of his financial condition and from making an independent and informed decision on whether to renew the loan. The debtor passionately testified to his tireless efforts to make his businesses successful in the hopes that he could get on his feet again. However, he was not privileged to withhold critical financial information from the bank during the process, comprising the bank's ability to protect itself.

The debtor admits that he made oversights and mistakes in drafting the financial statements. However, he denies any intent to deceive the bank. The surrounding circumstances indicate otherwise – the sheer magnitude of the amounts involved, the repeated omissions on subsequent financial statements, and his oral statements to the bank. For instance, the debtor told the bank in 2003 the RBB debt was "settled" or "satisfied." However, it was not. A large portion of the debt was assigned to another creditor, and a portion of the debt remained with RBB. The debtor did not disclose the debt to RiverCity on subsequent financial statements. The debtor also told the bank in 2008 that his tax issues had been "resolved." However, his tax liability had only grown.

Conclusion

For the reasons stated above, the court concludes that the debt of Malcolm Clifton Davenport, V, to Frontier Bank is nondischargeable under 11 U.S.C. § 523(a)(2)(B). An order consonant with this opinion will enter separately.

Done this 24th day of June, 2011.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Court

c: Sherrie L. Phillips, Attorney for Plaintiff
   Michael A. Fritz, Sr., Attorney for Debtor

24